First case for argument this morning, United States v. Carreno. You may proceed. Good morning, Your Honors. Stephen Kaler on behalf of Mr. Carreno. Your Honors, five years after Mr. Carreno was indicted, nearly two years after the trial, I am now finally making the closing argument to which Mr. Carreno was entitled. The problem is, although I am delighted to be here today, this is not the appropriate form, and that is the gravamonte of this appeal. It is our position that the District Court abused its discretion, and this was not harmless error, when it precluded the defense from discussing evidence relating to Jesus Sanchez, reasonable inferences from that evidence, and when it precluded the defense from introducing the testimony of a child-suggestibility witness. Now, Your Honors, we have briefed extensively Mr. Carreno's motion to dismiss the indictment under Valenzuela-Bernal, and I believe that's a thorny legal issue that requires this Court to closely examine again the Valenzuela-Bernal decision. Should I have time in my argument, I will revisit that issue. But the problem I find most troubling in this case is that the defense was not permitted to argue facts that were central, that were central to the defense of this case, and that went to the only disputed element in the case. Before I launch into the centrality of this argument, I would like to emphasize the practical ramifications of the remedy we seek. There is no dispute that Mr. Carreno is guilty of transporting aliens. He effectively entered a slow plea to that count. He did not contest it in the trial court. He does not contest it here. Regardless of this Court's decision today, Mr. Carreno is serving time and will continue to serve time for the alien transportation charges. Our concern is the conviction for hostage-taking, one of the first convictions of its type in our district. And our position is that by precluding the defense from eliciting facts that went to the one key disputed element, the district court impermissibly infringed upon Mr. Carreno's Fifth and Sixth Amendment constitutional right to present a defense and for effective confrontation. I mentioned the centrality of this issue, and I'd like to hit upon that again, because truly the only real disputed element in this case was the intent, the mens rea, of Mr. Carreno. Did Mr. Carreno intend to take hostages? Did he intend to hold those boys to coerce payment when he drove away from San Rafael in that van? What's the burden that you have to demonstrate for this habeas to be overturned? Your Honor, this is a direct appeal. So I think that because there was an objection below that we need to show there was an abuse of discretion, and because we preserved our constitutional objections, it is the burden on the government to show harmless error. And the error was not harmless, Your Honor. The error was not harmless. Which specific error was not harmless? Your Honor, particularly the two errors that I'm focusing upon is the district court's refusal to permit the defense to elicit facts relating to Jesus Sanchez. Sorry? The two specific errors I would like to emphasize are, first, the district court's refusal to allow the defense to elicit facts regarding a key, central, neutral, recipient witness, Jesus Sanchez. You're talking about the witness who was sent across the border? Exactly, Your Honor. Okay. And the second error is the district court's refusal to permit the defense to call an expert on child suggestibility to contextualize the extremely prejudicial, the inflammatory threats that were alleged against my client. Why don't you get specifically to those two issues then? I'd be delighted to, Your Honor. The district court abused its discretion by refusing the defense to discuss facts relating to Jesus Sanchez. Jesus Sanchez was the sole, neutral, recipient witness to the key event in the entire case. In the case, there was a discussion in a parking lot outside of a van and between a van and a truck. There were only three witnesses to that discussion, and that discussion is central to the case. One witness was my client who testified. He obviously has bias because he was facing these charges. A second witness was Jaime Pineda, who was affiliated with a family. Mr. Pineda obviously has bias. He is affiliated with a family and was receiving immigration benefits at the time. The only witness who did not have an ax to grind in that interaction was Jesus Sanchez. He is the only neutral, recipient witness to that conversation. Your Honor, can you elaborate a little on the bias of the man you say was biased in favor of the government? I'm sorry, Your Honor? What was the bias of the witness you say favored the government? Jaime Pineda, who was affiliated, had two problems as far as bias. One, he was closely affiliated with, he was the nephew or the brother of Maria Gomez de Pena, so he's closely affiliated with a family. But that by itself wouldn't make him want to convict somebody else with it. And secondly, Your Honor, he was receiving immigration benefits, as was the entire family, at the time of the trial. He was a government witness, and there was no dispute he was a government witness who was receiving. Was that brought out at trial? It was, Your Honor. What was not brought out at trial is that there was a neutral, recipient witness. So the jury could have discounted, if they wanted to, that he was somehow being benefited by the government? They could have, Your Honor. What the jury could not have done is realize that there was a neutral, recipient witness. Well, you're attributing quite a lot of malevolence to someone who is getting an immigration benefit. He's sending somebody to make presents at him because he's getting this benefit. That's quite a strong accusation. I think it's an accusation to which the defense was completely entitled to make, Your Honor. It was an inference, a fair inference, from the benefits that he received. Well, I assume they then made it to the jury. That argument did make it to the jury. What did not make it to the jury was that there was a witness who had no affiliation with either party, who was there, who was present, and who heard the discussion. You say he heard the discussion? Yes, Your Honor. Reflecting on recollection, what is the evidence that he heard the discussion? Your Honor, in the Sanchez 302 at ER 195, Mr. Sanchez reports that there was some sort of disagreement about money during that discussion. So he must have heard, presumably he heard the discussion because he reported the content of that discussion. He heard something, but I think it's a little beyond the record that he was a participant to the whole discussion and could have testified to it. Your Honor, the defense has never contended that he was a participant in the discussion. Is there another witness, Parris? Parris? Yes. No, Your Honor. Only Pineda? I'm sorry? There's only Pineda? In that central discussion, outside of the van, there's only Pineda, affiliated with the family, Carreno, my client, the neutral witness, Sanchez. And that witness was deported before the defense had an opportunity to speak to him. Well, it ties in maybe with your second question as well, but there's the children. I mean, the only evidence on which he was convicted was not simply that conversation. Exactly, Your Honor, and that's what's particularly troubling about the district court's rulings because the defense suffered allegations of an incredibly inflammatory sexual threat, a threat first elicited by AOSA Mike Wong nearly two years after the event. And we were denied the ability to contextualize that statement in the trial. This also relates to Jesus Sanchez because Jesus Sanchez was in the van as it departed Montecito Plaza. Jesus Sanchez did not report a sexual threat. Jesus Sanchez did report that he heard conversations inside the van. So he was a neutral percipient witness inside of the van. Your argument is because he might have heard a discussion at the parking lot and he might have heard a discussion within the van that the government in exporting him from the United States, deporting him from the United States, has committed a violation such that this entire indictment should be set aside. That is an argument we have posited, Your Honor. But if I may, I would like to focus on my primary discussion today, which is even if the court refuses to dismiss the indictment, the district court erred by refusing the defense to comment on those facts, to comment on the deportation, to comment on the absence of a neutral percipient witness who heard... You were able to comment on there being another person there, but you were not able to comment on what? Your Honor, the district court only permitted the defense to comment on the fact that Mr. Sanchez... ...did not hear any allegations of a sexual... ...was entitled to take that fact into consideration... ...what issue... ...when evaluating the reliability, the thoroughness... ...reliability of... ...and the completeness of the government's investigation into this case. You're getting to something else, it seems to me now. What did you want to argue that the absence of this witness had to do with the guilt or innocence of your client? Your Honor, the absence of witness Jesus Sanchez went directly to reasonable doubt... ...because the government did not call the sole neutral percipient witness to two critical events. Well, wait a minute. We don't know that. You can't testify that he knew it because you didn't get a chance to talk to him. You're assuming he could testify to these issues. But the end result is what you're saying to the jury is that because the government deported... ...there's been a violation such that they can't convict the witness... ...even though you don't know... ...we won't be able to tell you what he said, what he would have said. Your Honor, that is exactly the government's argument for closing argument. And that exactly is a question that the jury should take into account. My complaint is I was not permitted to argue that reasonable inference... ...and it is a reasonable inference... ...based on the undisputed facts as elicited in the 302. Well, it seemed to me if you look at the missing witness instruction and how it's normally given... ...it presumes that the government has access to the witness, which at this point they don't... ...although I recognize you say that's because, quote, they deported him... ...although that seemed to have occurred without any bad faith or it just happened... ...even though the prosecutor had asked for everybody to be retained. So it seems to me here, because he has some testimony in his 302 that's both favorable and potentially unfavorable... ...although we don't know, it's only potential... ...that the court might have been in error had it issued a missing witness instruction. Your Honor, even if the court was correct in refusing to issue the missing witness instruction... ...it was absolutely incorrect in its 403 analysis... ...from eliciting those facts and arguing those facts... ...because it deprived the jury of the ultimate right to make an evaluation. So let me just detail this so I can evaluate it. The specific facts that the court erred in excluding were the deportation... Two primary categories, Your Honor. The first is information. The first category is information relating to Jesus Sanchez. Right. Oh, okay. The second category is the refusal to allow the child's accessibility expert. Okay. So let's take the second one first. And that was a question of the trial court's discretion to admit an expert, correct? Exactly, Your Honor. But in this case, the jury... I mean, the child was cross-examined, right? Correct. And, in fact, he was cross-examined so the jury could see that, like most children... ...he's not a 100% perfect witness, correct? Correct. So if he hadn't been cross-examined, I could see there would be a problem. But since he was cross-examined and the jury could evaluate, and it's sort of common sense... ...you don't need an expert to tell you about children and suggestiveness... ...why was it a fundamental error, which is what we have to look at on this direct review... ...to exclude that testimony when normally the trial court has broad discretion? It was an abuse of discretion, Your Honor, when he excluded that witness without a Daubert hearing... ...because I think the court credits my abilities too greatly. I was able to cross-examine that child witness. I was not able to explain the concept of child suggestibility. I was not able to explain the scientifically demonstrated concepts... ...of the impact of authority figures when interviewing a witness. Wouldn't you say that was a matter of common sense? No, Your Honor. I do not think so. I think that Dr. Eisen's proffer, and Dr. Eisen's proffer can be found at ER1-168... ...detailed many factors and scientific studies that show the concept of child suggestibility... ...that far exceeded my ability to elicit that in trial. Dr. Eisen would have testified that children are more suggestible to authority figures. These children were interviewed by authority figures. He would show that the substantial elapse of time makes children particularly vulnerable to false memories. I was not able to explain or elicit that fact. He would have testified that the use of leading questions... ...particularly create the situation where children can create false memories. A.O.S.A. Wong here in this courtroom used those type of leading questions to elicit the sexual threat. I was not able to present the type of evidence to contextualize those statements. And the key difference, Your Honor, is the difference between credibility and reliability. I was well able to attack the credibility of the children, and I think I did so on the cross-examination. But I was not able to provide the scientific context of the reliability of those children. And by precluding the defense expert on this central, central issue to the only element at trial... ...the district court abused its discretion, particularly in that it never even held a Daubert hearing on the issue. We showed many factors, and I think the court has identified some of those points in the cross-examination... ...that raises the reliability of these children into question. Reliability, not credibility. Dr. Eisen would have contextualized those. He would have shown how interviewing a child two years after the event, asking leading questions from an authority figure... ...is fertile field for false memories. And by not being able to contextualize those incredibly inflammatory... I mean, that just seems to, you know, I know there's the big false memory, and, you know, in trials... ...everyone's had these various experts. But here, you know, you did a great job. I mean, he misremembered. He had two years' delay. He had leading questions. There was a difference between the threat to the mother and the threat to the child. I mean, you really had everything there to argue all that to the jury, did you not? I mean, it would have been icing on the cake, and it might have been nice. But I think what we have to evaluate is, was it mandatory? And I'm not, maybe there's a case you can cite me to that I can look at to see. I mean, I think it would be great to have this person. There's no doubt about that. It would have bolstered your argument. But that doesn't mean that the judge was required to give it. So what would I look to, do you think, for the best support for that argument? Your Honor, it wasn't the icing on the cake. It was the cake. And to support that proposition, I would refer the Court to People of Territory of Guam v. McGravy, cited in the briefs at 14F3rd 1344, recognizing that an expert in child suggestibility may be appropriate. But I would particularly urge the Court to consider the New Jersey case, the Supreme Court of New Jersey case at 136 New Jersey 299, which is the most thorough judicial discussion of the importance of the role of child suggestibility. And it was absolutely essential in this case. Your Honor, I note my time is nearly up. Do you want to reserve some time for rebuttal? If I may, please, Your Honor. Yes. Thank you. Good morning, Your Honor. It may please the Court. My name is Michael Wong. I represent the government in this case, and I was co-counsel at trial along with my colleague, Lou Davis. The defendant has argued this morning that Jesus Sanchez was the sole neutral percipient witness, and I think the record demonstrates that none of those characterizations are correct. With respect to neutrality, as the Court has discussed somewhat, there's just nothing in the record to suggest that this witness was lacking in bias, but the other witnesses were. The defense is using nothing but assumptions to support the inference that Jaime Pineda was biased and that Sanchez was not biased. In fact, the record showed that Sanchez was described by law enforcement during their interviews with him as not forthcoming. They said he clearly didn't want to get involved. He wanted to minimize his role, and that was something that was in the record, and that's something that the district court had before it. And I would also add that there were two other witnesses who were inside the van who were, if a non-relative and non-party can be described as neutral, Lloyda Perez and Efrain Mirandez also witnessed the conversation. That's why I asked about Perez earlier, and counsel said no, he was not a witness. So maybe you could explain where Perez comes in. Yes, Your Honor. Both Efrain Mirandez and Lloyda Perez were inside the van. Mr. Sanchez was outside the van. That was the only difference between Sanchez and the two other passengers. Now, Lloyda Perez testified at trial that she could not hear the conversation inside the van, but she said based on body language it seemed to her that the uncle was upset, that he was moving his hands the way his face was. And also Mr. Miranda described what happened outside as a disagreement. He was also inside the van. The difference that the defendant draws between these passengers inside the van and Mr. Sanchez outside the van is that they assume that because Mr. Sanchez was outside the van, he must have been able to hear the conversation. But there is nothing in the record to suggest that he heard anything. He did describe the general nature of the argument outside the van to law enforcement. But he didn't – there's no evidence that he heard any specific words or that he was paying attention other than just to note that the conversation seemed to be a disagreement over money, which is at the defendant's excerpts at page 92. So I would submit that the defendant's characterization of Mr. Sanchez as neutral and as percipient are both speculative. And based on what we do know about what he said, his testimony would have been cumulative of those of the other witnesses, as the district court specifically found. Well, let's assume that the district court erred in not letting in the 302. What would have been the impact? I mean, I guess what they're asking is that they should have been able to say, here's a witness, he can't be here today, of course, because he's been deported, and here's his statement on the 302. What would have been the impact on the trial had the 302 been in? Well, the 302 had two statements that the defense was relying on in the proceedings below in arguing that they ought to be able to use it. The first was the characterization of the disagreement over money. There's – the defense doesn't dispute that that's what the 302 says, but they just speculate that that was mistranslated and the district court found that the person who translated the statement was a qualified translator and there was never anything to suggest that this was not how. So if it came in, it just would have come in as written, which was the disagreement. Yes, that would have been a wash. And the other statement would have been Mr. Sanchez's statement that as the van was driving away from Montecito Plaza where the boy's family met with the drivers of the van to pick up the kids, after the disagreement over the money, the van left Montecito Plaza with the boy still in the van. Mr. Sanchez said that at that point the defendant said something like, be patient, your mother is coming to get you. This is sort of referred to as the consoling evidence? Is that the same evidence they refer to as? It might be. I think that would be the spin the defense would put on it. And the way the defendant claims that that is relevant is that that somehow negates the evidence that later on, when the van was on the bridge, the defendant turned to 8-year-old Carlos Gomez and said, if we don't get our money, we're going to use you like girls or send you back to El Salvador. Our submission would be that one does not negate the other, that it would have been inappropriate for this hearsay to be admitted without the benefit of cross, and that this did not negate the government's intent evidence, nor did it corroborate anything that the defendant offered in its case. The statement that Mr. Sanchez attributed to the defendant was not claimed to have been said by the defendant at any point, neither in his two law enforcement interviews or in his two times testimony in court in an evidentiary hearing and in trial. So the admission of the 302, I believe, would have been cumulative and at best very weakly in support of the defense case, if even that. There's no question about his unavailability. There's no question about that. And the government certainly can't contend that there's something bogus about the statement. It's the government's statement. No, there's no contention that he didn't, that Sanchez didn't say that. The question is whether that supported the defendant's case, whether that was in any way exculpatory or even corroborative of anything else in the defendant's case. Did the defendant offer the 302? The defendant did seek to offer the 302. And have a basis for doing so because of the unavailability of the witness and the fault of his own. What was the objection of the government to the 302 statement? The government's objection was that this was hearsay, that it didn't. It's always hearsay under these circumstances, but go on. It would be, but under some circumstances a hearsay statement can still be admitted. And the government's position, which was also the district court's position, was that this did not meet, this statement did not meet any of the indicia of trustworthiness that are required by the capital hearsay exception. I don't quite understand that. The statement itself was taken by the government. I would think there was every indicia that there was nothing wrong with the statement itself. What was your specific objection to the 302 statement coming in? Your Honor, the government's objection was that this is a classic sort of case where cross-examination would have been of high utility, and the standard is whether Well, that's always true when the witness is not available, but we allow statements in when witnesses are unavailable under certain circumstances. So specifically what was your objection to the 302 statement offered by the defendant? Our objection was that the record before the district court showed that this witness was described by law enforcement as not forthcoming, as not wanting to get involved, and that cross-examination concerning the statement, exactly when it happened, what was said before and afterwards, and other contextual information about the statement would have been necessary and at least of more than marginal utility, which was the legal standard for it to be admitted without cross-examination. So the basis of your objection was you couldn't cross-examine the witness whose statement you took after the government had deported him. That was your argument. That's correct, Your Honor. And what was the basis of the district judge's determination? That the district judge agreed with the government's argument about this statement not meeting the requirements under Rules 807 and the precedents interpreting the standards under that rule. Now, just specifically tell me what was the basis of the determination by the district court of not allowing the 302. Did he say that it was because it can't be cross-examined? Did he say it was because it doesn't add anything to the case? What did the district court rule? Your Honor, my recollection, I don't have the ruling in front of me, but my recollection is that there were many evidentiary rulings, and this is one on which the district court ---- Well, if you don't know, you don't know, and that's fine. I just wondered if you knew. I don't know off the top of my head. To be candid, I don't recall an extended discussion about this issue, although there may have been. Okay. Thank you. Do you want to address the other question that an expert would have been very helpful to the jury? Would you address the other question of the helpfulness of the expert on child suggestibility? Certainly, Your Honor. Certainly. The district court did not exclude this expert on Daubert grounds. What the district court found was that the expert testimony as proffered by the defense was not based on sufficient facts or data as required by Rule of Evidence 702, Sub 1. And as the Court is aware, the factual findings underlying rulings on admissibility of expert testimony is reviewed under the clear error standard. And here the district court did not clearly err in finding that there was no factual evidence of suggestion to Carlos Gomez, the young boy, that would render the expert testimony relevant to an issue in the case. All of the evidence in the record that the defendant points to as supporting suggestibility simply do not lead to the inference that there was any such thing. For example, counsel has said this morning that the government used leading questions to elicit the threat from Carlos Gomez. And I would submit that the record shows that's not the case, and I would direct the Court to Paragraph 8 of the declaration at Excerpts of Record 190, where there was a specific declaration that only open-ended questions were used with Carlos Gomez. Let me go back. I'm looking at the district court's decision on this. I don't think it was a factual determination that we necessarily give deference to. He said that it lacked factual relevance. That seems to me to be a legal question. And then he went on to say he thought it would take up too much time and didn't think it was necessary. All that seems to me to be a legal question that we review, not some deference to a factual finding. Am I wrong about what his actual decision was? Well, Your Honor, I don't recall that he said that this expert testimony would have been irrelevant if there had been a factual predicate for it. We never got to the point of Galbraith admissibility. What the Court ruled was that there was just no factual basis for this witness to testify based on the expert proffer, even if it otherwise would have been relevant. That, in other words, for an expert to talk about things that might suggest a child was suggested, what is clearly not in the record, such as leading questions, the use of stereotype induction, and other indicia that were detailed in the expert proffer of this witness. When did you first get the statement from the child? That was in late December of 2001. Which was two years after the event, more or less? It was two years after the event. Was that made to you, or who was it made to? It was made to myself and an agent. And do we know what questions you asked that prompted that? Yes, that's also in the record at 190. The child was asked, just tell us what happened. So there's a record of that in the record? Yes, there is. But wait, he wasn't asked what happened. Didn't you also ask him if anyone had said anything about sex? That was what the child testified on cross-examination. But in terms of the government submissions of what happened, that didn't appear anywhere. But that was all before the district court. Well, okay. So you have that the child said that he had been asked by you or another prosecutor whether he had heard anything about sex, right? Well, he first came up with it. He first came, first recollected the threat in response to open-ended questions in December of 2001. And the two years prior to that, he really hadn't been interviewed because the case had been tied up in other procedure. In January, when we were preparing him for evidentiary hearings, it may have been that he was asked, okay, we're going to have to come back. Well, no, it may have been. You know, what's in the record? He says they asked him whether either Flores or Creno had said anything about sex. Now, first you say, no, we just asked him general questions. Now you're saying, well, we may have asked him something. What did happen?  I appreciate that, Your Honor. The question to the boy was, when did you first remember the threat? And the boy said something like, when somebody asked something about sex. But the submissions the government made were that he was first asked about it or when he first came up with it, it was in response only to open-ended questions. That's what's in the record. All right. The district court, as I recall, made its determination based upon two rules. It ruled under 702 on the basis that it wouldn't materially assess the jury and ruled on the basis of 403 that it would unduly complicate the case itself. That's correct. Are those the sole rules relied on by the district judge? That was the focus of his attention. Is that correct? Yes, Your Honor. The focus was 702, and then the 403, as we understood it, was a ruling in the alternative, that even if there were any relevance, that relevance was or if there was any probative value, that was very slight and significantly outweighed by the undue consumption of time and prejudice. But those were the basis for the rulings. Now, just to close the loop on the leading questions, it is true that the San Rafael police used leading questions, but that was two years before. And in response to those leading questions, there was no recollection of any sexual threat, and they didn't ask him specifically about that. So I would assume that there is quite a disconnect between the notion that the leading questions asked by the San Rafael police two years before the ultimate recollection led to the ultimate recollection response to open-ended questions two years later. What would the prejudice have been? You said the district court said there would have been prejudice in letting the expert testify? Yes, Your Honor. No, you can answer that. What prejudice would there have been? I don't know if you need to look at a record. I just want to be sure I'm accurate about what the district court said. Our submission was that, as courts have held, expert testimony can be very misleading because of how difficult it is to evaluate it. And that's why courts, including this court, have held that. And what would the prejudice have been? Your argument, what was the prejudice? The prejudice would have been to mislead the jury into thinking that there was some sort of factual predicate from which it could find that the child had been suggested, and that was just not the case. And as the court has pointed out, this was something that the defense was able to, at least with respect to the boy's credibility, they were able to attack the boy's credibility based on common sense notions and didn't need an expert taking up the court's time, taking up the jury's time, possibly misleading the jury to cross-examine the boy and to make that argument. Thank you. Thank you, Your Honor. Thank you. The expert witness was not the icing on the cake. He was the cake, and this discussion illustrates why. Those children were not asked open-ended questions about whether or not sex took place. This is what they were asked at ER 3 at 672 lines 2 through 5. And this is my examination of Carlos Gomez. And it was only after they asked you that the tall guy with glasses or the short guy say anything to you about sex that you first said yes, this is what they said, right? And the child responds, uh-huh. That child reported a sexual threat two years after the event took place. The government is incorrect to say he was not really interviewed before then. He was interviewed at least five times by INS agents during that interim period. That child was subjected to leading questions by an authority figure, questions that suggested a sexual threat. And he responded yes. Now, the government could introduce that evidence. That evidence was permitted after a taint hearing, and we have no complaint with the introduction of that evidence. My complaint is that I was powerless to contextualize that statement in front of the jury. And that statement was dynamite. That statement was the essence of the trial. Mr. Davis, who closed in the trial. Let me ask you this. I realize that if we write an opinion, it has to be in the context of this case. But from your argument, it would seem that in every case with child witnesses where there were potentially leading questions, that your argument would lead to the conclusion that the judge must permit an expert. To the contrary, Your Honor. My argument, I think, is strictly limited to the facts of this case. I would say in a case where there is a child witness who is interviewed by law enforcement, who are not trained forensic examiners, when that interview began one day and then that witness is sent home to speak with his mother, who herself received a sexual threat, and then picked up on another day when that child is subjected to five years of interviews, or excuse me, five different interviews over two years, where a sexual threat is first elicited two years after the event, when that sexual threat is elicited in an interview that is not recorded, when that statement is elicited in leading questions, I think the defense at minimum should have the right to contextualize that threat by the introduction of child suggestibility evidence. And Judge Noon and I would posit that there was no prejudice for this witness. There is no prejudice as to delay because Mr. Carreno's concession of the alien transportation counts shrunk this from a two-week trial to a one-week trial or less. There was three years, two years of litigation preceded this trial. This witness would have added one afternoon. The jury would not have been confused. The court had at its hand instructions that could have provided the jury with guidance as to the importance of the witness or the relevance of the expert witness. There was no prejudice. So the district court did abuse its discretion in not admitting that testimony, and that error was not harmless. Mr. Carreno did not receive a fair trial. Thank you. Thank you. The United States v. Carreno is submitted. Next for argument this morning is Bockington v. Bayer. Those are pretty good arguments. Good job dodging the bullet. Thank you. Good morning. You may proceed. Franny Forsman, Your Honors, appearing on behalf of Marvin Bockington. Mr. Bockington has been in prison for over 15 years now based upon a trial in which the only person who is alleged to have been a witness to the crime did not testify and a post-conviction proceeding in state court where he wasn't present and he wasn't represented by counsel. The facts which the State has relied upon in its brief are facts which were
judges: Wallace, McKeown, Callahan